260 N.J. Super. 475 (1992)
616 A.2d 1336
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES DONALD CECIL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 1992.
Decided December 1, 1992.
*477 Before Judges ANTELL, DREIER and SKILLMAN.
John Vincent Saykanic argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; John Vincent Saykanic, designated counsel, of counsel and on the brief).
Arthur S. Safir, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Arthur S. Safir, of counsel and on the letter brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
Defendant was convicted by a jury of terroristic threats, N.J.S.A. 2C:12-3a and 3b, causing widespread risk of injury, N.J.S.A. 2C:17-2c, false public alarms, N.J.S.A. 2C:33-3a and 3b, and aggravated assault, N.J.S.A. 2C:12-1b(5). The trial court merged all of the convictions, except for aggravated assault, into the conviction for terroristic threats, N.J.S.A. 2C:12-3a, and sentenced defendant thereon to a custodial term of five years with a two and a half year period of parole ineligibility. On the conviction for aggravated assault, defendant was sentenced to a concurrent eighteen-month term. He was also ordered to pay a $60 fine to the Violent Crimes Compensation Board.
Against the advice of his attorney, defendant maintained at trial that he was coerced into committing the terroristic crimes by two men who threatened harm to his children if he did not comply with their wishes. On this appeal he contends that his defense at trial was the product of a hallucinatory or delusional psychotic episode and that the trial court erred in not conducting *478 a competency hearing sua sponte and in allowing him to forego the defense of insanity and diminished capacity.
On April 13, 1989, defendant arrived at the Union County Court House carrying a cane and a briefcase. The purpose of his visit was to attend a pretrial conference in connection with a criminal matter wherein he was a defendant. During his appearance before the court, he announced he was carrying in his briefcase a bomb which he had "just clicked on." Accompanying that announcement was a demand by defendant that President Bush be brought from Union High School, where he was speaking, to the Court House. Court officers surrounded defendant, wrestled his briefcase away, and took him into custody. During the struggle defendant swung his cane, striking one of the court officers. A bomb disposal unit responded to the scene, removed a device from defendant's briefcase and determined that it was not an explosive.
Defendant testified on his own behalf that earlier that morning two men with guns came to his home in Rahway. According to defendant, they placed what they said was a bomb in his briefcase and ordered defendant to take it to the Court House and instruct the judge that President Bush was to be "`brought to the courtroom to deliver a message.'" He described the men, one of whom was named "Skull" and the other named "Indian," as being respectively six foot four and six foot five, and both dressed in military combat fatigues. They knew the whereabouts of his two daughters, who were living with their mother, and clearly implied that harm would come to them if defendant did not follow their instructions.
Defendant stated that when he arrived at the Court House, the two men followed him and walked through the metal detector while the officer on duty was questioning defendant about the contents of the briefcase.[1] Defendant said they were *479 dressed the same as before except for the fact that they were not wearing masks. He explained that he was "literally shaking inside" and the thought occurred to him that if he could get himself arrested he might be able to avoid having to go through with the plan. Therefore, he created a few disturbances in the building, but did not accomplish his purpose.
The officer on duty at the metal detector testified that no one wearing army fatigues passed by while she was talking to defendant. She was quite clear about this because she had been given specific orders to check for people entering the building dressed in army fatigues since someone wearing such garb had troubled the court house in the past.
Because of the obvious doubts concerning defendant's account of the events leading up to the crime, and defendant's history of bizarre behavior, defense counsel urged defendant to interpose a defense of insanity based upon what appeared to be a delusional or hallucinatory episode. This was categorically refused by defendant. During a pretrial hearing before Judge Wecker, the judge questioned defendant as to why he had determined not to pursue the insanity defense, despite counsel's advice to the contrary. In reply, defendant firmly and categorically stated that he would "not pursue an insanity defense when I'm not insane." Just prior to trial, Judge Span also addressed defendant and advised him that although doctors had made a finding that he was competent to stand trial, there was a finding by at least one doctor that defendant was insane at the time of the criminal events. Defense counsel informed the court that defendant was aware of his right to assert that defense but that he chose to waive it. Defendant himself joined in the colloquy to state "that's exactly what I told Judge Wecker." Finally, the court also informed defendant of his *480 right to interpose the defense of diminished capacity. It was explained to him as follows:
In other words, each of these crimes of which you are charged requires a certain mental state, either purposeful behavior, knowing behavior or reckless behavior. And what diminished capacity can do is lead to a finding of not guilty by reason of mental diseases or defect that causes a person to be unstable at the time.
Defendant answered that he understood this, but did not wish to raise that defense either. He stated the following:
I've gone over this with my attorney several times. I know what happened that day and it's not true to use that type of defense. I chose to go through with the way it happened, not with something else. It's going to go through with the way it happened. The truth.
Defense counsel never raised the question of defendant's competence to stand trial. Indeed, he stated that defendant was "definitely" competent, and, although the trial judge questioned defendant after reviewing three psychiatric reports, no formal competency hearing was held. Defendant now argues that there was a bona fide doubt as to his competence to stand trial because one psychiatrist found defendant incompetent, and because of defendant's behavior and mental history.
A defendant tried or convicted while incompetent to stand trial is deprived of his due process right to a fair trial. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Consequently, a court must hold a competency hearing, even when not requested, where the evidence raises a bona fide doubt as to a defendant's competence. Id. at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822; State v. Spivey, 65 N.J. 21, 37, 319 A.2d 461 (1974); State v. Pugh, 117 N.J. Super. 26, 31, 283 A.2d 537 (App.Div. 1971), certif. denied, 60 N.J. 22, 285 A.2d 563 (1972).
Whether the evidence raises a bona fide doubt as to a defendant's competence is often a difficult question as there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." Drope v. Missouri, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103, 118 (1975). The Supreme Court, however, explained in Drope that:

*481 The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.
Ibid. A lawyer's representations concerning the competence of his client is also a factor to be considered, although the court need not accept that representation without question. Id. at 177, n. 13, 95 S.Ct. at 906, 43 L.Ed.2d at 116.

1. Defendant's Prior Irrational Behavior
It appears that after defendant was arrested and was awaiting trial in jail, he allegedly set fire to his jail cell twice, which prompted a stay at the Trenton Forensic Psychiatric Hospital from May 14, 1989 to June 5, 1989. During his stay, defendant apparently refused to take his medication and became belligerent, hostile, disorganized and manic. In our view, although this event, which occurred well over a year before defendant's trial, may be evidence of defendant's mental problems, it does not suggest that defendant did not understand the nature of the proceedings against him.

2. Defendant's Demeanor at Trial
Defendant's demeanor was normal during the pretrial conference and throughout both trials.[2] Both judges observed defendant, questioned him, and were convinced he was competent to proceed to trial. On May 8, 1990, defendant appeared before Judge Wecker for a pre-trial conference as to both indictments. Defense counsel summarized the psychiatric reports and advised the court that defendant did not wish to pursue the insanity defense on the second indictment despite counsel's opinion that it would "stand a great chance of success." Defense counsel also stated that there was no question in his mind that defendant was competent to stand trial and *482 that he had the right to decide whether or not to pursue the insanity defense.
Defendant also claims that at sentencing the trial court itself noted defendant's lack of competence. The court's actual words were the following:
I believe at this point in time that you are a very dangerous man and I do believe you are psychotic.
I listened to your testimony here and I believe personally that you believed every word you were saying and that you believed you were acting under duress. I don't believe that it could in any way be true and I believe it's a delusion and it's a result of your psychosis.
However, while Judge Span indicated that she believed defendant was psychotic, she also clearly stated her belief that defendant was competent:
I did read the doctors' reports prior to the trial. We did have a short hearing and I know Judge Wecker also made the same determination, that you were competent to stand trial. That's what the doctors felt. That's what your attorney felt. That's what I still believe, that you're competent. It's not the same thing as being competent and being insane. I believe you have a delusional system that works in certain respects, while you're totally lucid in others. You're certainly aware of what's happening today. I believe you were competent under our standards to waive the insanity defense.
The trial court recognized the distinction between insanity and incapacity to stand trial, and found defendant competent to stand trial.

3. Medical Opinion as to Competence
Well before trial, the court ordered defendant to undergo a 30 day evaluation at the New Jersey Forensic Psychiatric Hospital to determine if he was competent to stand trial on both indictments. The prosecutor and defense counsel also requested independent examinations of defendant. A summary of the resulting psychiatric reports and those previously made follows:
Peter Schiffman, a Diplomate in Psychiatry, examined defendant on September 27, 1989, at the request of defense counsel. Dr. Schiffman observed that defendant's speech was pressured and illogical and that he was delusional. Defendant related his version of the incident, and said that he thought he had met Jesus Christ on Good Friday of 1989. Dr. Schiffman diagnosed *483 defendant as suffering from an atypical psychosis, and concluded that defendant was not competent to stand trial. Dr. Schiffman reasoned:
[Defendant] is oriented and understands the nature of the legal proceedings against him and the functions of the various participants in those proceedings. However, he is so illogical and disorganized that he cannot rationally discuss the charges against him and cannot assist in the preparation of a defense. He is thus currently not competent to stand trial. He requires inpatient psychiatric treatment and antipsychotic medication to help him regain competence.
The State requested a second examination by Dr. Stanley R. Kern, also a Diplomate in Psychiatry. Defendant refused to cooperate in the examination because "the other doctor talked to [him] for only five minutes and said [he] wasn't competent." Accordingly, defendant would not talk to Dr. Kern.
Dr. Manolo Mempin, a psychiatrist, prepared the court report from the New Jersey Forensic Psychiatric Hospital on January 11, 1990. Dr. Mempin's diagnosis was that defendant suffers from a "Bipolar Disorder, Manic Type, in Partial Remission." Dr. Mempin concluded that defendant was competent to stand trial, but further opined that at the time of the spurious bomb incident defendant "was laboring under a defect of reasoning from a disease of the mind, such that he did not know the nature and quality of the act he was doing."
The final expert evaluation came from Peter Krakoff, Ph.d., who examined defendant at the request of defense counsel. Dr. Krakoff interviewed defendant on April 25, 1990, and concluded that defendant was competent to stand trial. Dr. Krakoff did not give an opinion as to defendant's condition at the time of the offenses because defendant would not discuss background information. Dr. Krakoff noted that defendant told him he was currently on lithium and the doctor wrote that:
It would be useful to know exactly when he has been on Lithium and other medications. This would help clarify the role of medication and lack of it on criminal history and past mental status evaluations.
It appears from the psychiatric reports that defendant has some history of psychiatric problems. As we said earlier, he was hospitalized at the Forensic Psychiatric Hospital from May *484 14, 1989, to June 5, 1989, when he allegedly set fire to his jail cell. During that hospital stay, which occurred shortly after his arrests in the incidents for which he was convicted, defendant refused to take his medications and became "belligerent, hostile, disorganized and manicky." While the admitting physicians stated that defendant had a long history of psychiatric illness and was hospitalized at the Trenton Psychiatric Hospital with a diagnosis of paranoid schizophrenia, there was no such record at the Trenton Psychiatric Hospital. Nevertheless, defendant admitted to a previous psychiatric evaluation at the Marlboro Psychiatric Hospital and to outpatient treatment at the Rutgers Mental Health Center in 1984. The treatment at Rutgers supposedly was made pursuant to a Family Court order to evaluate his status for visiting his children who were in the custody of his ex-wife. Finally, defendant was not taking any medication at the time of the offenses, but was on lithium at the time of the psychiatric evaluations.
Defense counsel now argues that Dr. Schiffman's report was sufficient to raise a bona fide doubt as to defendant's competence to stand trial. During his trial, however, defendant himself maintained that Dr. Schiffman did not give him a fair evaluation because the interview lasted for only five minutes. More importantly, Dr. Schiffman's report was not the most recent report, he having examined the defendant in September of 1989. In December 1989, Dr. Mempin examined defendant and found him competent to stand trial, notwithstanding his further opinion that defendant was probably insane at the time of the offense. The last expert examination occurred in April 1990, approximately five months before his trial date. Dr. Krakoff found that even though there were "many indications of serious mental problems at the time of the courthouse incident," defendant "met the requirements of competence."
In sum, two of the three psychiatrists found defendant competent to stand trial, and those reports were closer in time to defendant's trial date than was Dr. Schiffman's unfavorable *485 report, which was based on a five minute interview one year before defendant's trial.

4. Defense Counsel's Opinion
Each time defense counsel raised the issue of defendant's ability to waive the insanity defense, defense counsel opined that defendant was competent both to stand trial and to waive the insanity defense. Defense counsel told the court that defendant had contributed to his own defense. He further stated that in light of the two reports finding defendant competent, it was unnecessary to request the court to hold a competency hearing.
The test of competence to stand trial on criminal charges is set forth in the following language of N.J.S.A. 2C:4-4b:
(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
(2) That his elementary mental processes are such that he comprehends:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;
(c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;
(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.
Given the totality of the circumstances, the trial court did not err in failing to pursue further the question of defendant's competence to stand trial. Evidence that a defendant may be suffering from mental illness does not necessarily raise a bona fide doubt as to his competence to stand trial. State v. Spivey, 65 N.J. at 39, 319 A.2d 461; Aponte v. State, 30 N.J. 441, 452-53, 153 A.2d 665 (1959); State v. Khan, 175 N.J. Super. 72, 79, *486 417 A.2d 585 (App.Div. 1980). Moreover, a comparison of the evidence herein with evidence found sufficient to warrant a sua sponte competency hearing in other cases fortifies the trial court's determination that defendant was competent to stand trial.
In Pate v. Robinson, supra, the evidence before the trial court consisted of uncontradicted testimony of defendant's long history of disturbed behavior, including his hearing voices and having hallucinations. 383 U.S. at 378-80, 86 S.Ct. at 838-39, 15 L.Ed.2d at 818-19. Defendant had also shot and killed his 18-month old son and attempted suicide twice. Id. at 381, 86 S.Ct. at 839, 15 L.Ed.2d at 819-20. Moreover, defense counsel there asserted that defendant was then insane, which the Court interpreted as placing into issue defendant's competence to stand trial. Id. at 384-385, 86 S.Ct. at 841-42, 15 L.Ed.2d at 821-22. Accordingly, the Court found that there was sufficient evidence to raise a bona fide doubt as to defendant's competence to stand trial. Id. at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822.
Similarly, the evidence in Drope v. Missouri, supra, was also more convincing than here. While on trial for raping his wife, defendant attempted suicide. 420 U.S. at 165-66, 95 S.Ct. at 900-01, 43 L.Ed.2d at 110. Prior to that attempt, as defendant's wife testified, he had assisted four men in raping her and subjected her to "other bizarre abuse and indignities." Id. at 165-66, 95 S.Ct. at 901, 43 L.Ed.2d at 109. She also stated her belief that her husband was sick and needed psychiatric care. Ibid. Two psychiatrists testified that there was reasonable cause to believe that defendant might not be mentally competent to understand the proceedings against him and that a psychiatric evaluation was necessary. Id. at 169, 95 S.Ct. at 902, 43 L.Ed.2d at 111. Lastly, defense counsel asserted that defendant was "not a person of sound mind," and requested a continuance for a psychiatric examination prior to trial. Id. at 177, 95 S.Ct. at 906, 43 L.Ed.2d at 116. The Court disagreed *487 with the lower court's finding that counsel's contention did not raise the issue of defendant's competence to stand trial. Ibid.
The evidence herein is also less compelling than in State v. Khan, supra. There, the court ordered an additional competency hearing where several psychiatrists disagreed as to defendant's competence to stand trial and where defense counsel had requested two of the five competency proceedings already held and the trial court initiated the others. Id. 175 N.J. Super. at 76-77, 417 A.2d 585. Here, defense counsel requested no such hearing.
In the case at bar, defendant, defense counsel, two trial judges, and two psychiatrists all believed defendant was competent to stand trial because he understood the nature of the proceedings and was capable of assisting in his defense. Only one psychiatrist expressed a contrary view. These circumstances differ materially from those considered in the foregoing cases and did not warrant the court in conducting a competency hearing on its own initiative.
We now address the "troublesome issue" considered in State v. Khan, 175 N.J. Super. at 80, 417 A.2d 585. As in Khan, defendant here contends that notwithstanding the court's finding that he was competent to stand trial, he was nevertheless incapable of making a knowing, intelligent and voluntary waiver of the insanity defense. The critical question appears to be whether defendant's apparent certainty about the reality of his delusional or hallucinatory experience precluded such a voluntary waiver of the insanity defense.
It is clear that court and counsel did not believe that defendant's mental disorder impaired his decision to waive the defense. However, there was no psychiatric testimony on that specific issue. The expert reports contained opinions as to defendant's competence to stand trial and as to his mental state at the time of the offense, but no opinions were proffered as to his ability to make a knowing and intelligent waiver of the insanity defense.
*488 Khan, on facts remarkably similar to these, states that the inquiry into a defendant's decision to waive the insanity defense must focus on the defendant's awareness of his rights and available alternatives, his comprehension of the consequences of failing to assert the defense and the voluntariness of his decision to waive it. The considerations applicable to this decision were discussed by Khan in terms of Frendak v. United States, 408 A2d 364 (D.C.Ct.App. 1979), in the following language which we excerpt at length:
Recognizing that a defendant might have a compelling reason to forego the defense of insanity, as, for example, fear of lengthy institutional commitment in the event of an insanity acquittal, the avoidance of the stigma of insanity or the loss of consequential legal rights, or the belief that raising the defense would be equivalent to an admission of guilt, 408 A.2d at 376-377, the court [in Frendak] concluded that "if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense." Id. at 378. Nevertheless, the court was impelled by "the underlying protective rationale of Whalem" [Whalem v. United States, 346 F.2d 812 (D.C. Cir.1965), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965)] to retain the discretion to raise the insanity defense sua sponte "when a defendant does not have the capacity to reject the defense." Ibid. The court said in summary:
... [W]e require the judge to respect the choice of a defendant capable of voluntarily and intelligently making that choice. The court will now have the discretion to raise an insanity defense sua sponte only if the defendant is not capable of making, and has not made, an intelligent and voluntary decision. [408 A.2d at 379]
The government's position that a finding of competency to stand trial is in itself sufficient indication that the defendant is capable of intelligently waiving an insanity defense was rejected on the ground that such finding "is not intended to measure whether the defendant is also capable of making intelligent decisions on important matters relating to the defense." 408 A.2d at 379. The following procedure was suggested:
... [W]henever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense ...
If the judge finds that the defendant is capable of making a voluntary and intelligent decision to forego an insanity defense, the judge must respect the defendant's decision and permit the jury verdict to stand ... If, on the other hand, the judge is convinced that the defendant can not or has not made such a voluntary and intelligent waiver, the judge has the discretion to raise that defense sua sponte. The strength of the individual's potential insanity defense should not be a factor in the court's decision, except to the extent *489 that such evidence is useful in determining whether the defendant presently is capable of rationally deciding to reject the defense. [408 A.2d at 380-381]
While we find the formula enunciated by Frendak to be largely persuasive, we must utter a word of caution with respect to the scope of the suggested hearing. It should not be converted into a second competency hearing, which would be the case if Frendak were followed in its entirety. Frendak speaks of a defendant's "capab[ility] of rationally deciding to reject the defense." Referring to Faretta [Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] and Alford, supra, [North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, (1970)] in which the Supreme Court permitted defendants to waive constitutional rights only after the trial judge had assured himself that the accused was capable of making a voluntary and intelligent choice, Frendak emphasizes that the trial judge must seek the same type of assurance when a defendant chooses to reject an insanity defense. 408 A.2d at 378. But any determination that defendant did not have the mental capacity to make that choice would necessarily conflict with the criterion in N.J.S.A. 2C:4-4b(2)(f), essential to a determination of a defendants fitness to proceed, that the defendant, as to plea negotiations or a guilty plea, "be able to knowingly, intelligently and voluntarily waive those rights which are waived upon such entry of a guilty plea." If the same kind of assurance were to be required in the case of a defendant's waiving the defense of insanity, it could not be said logically that a person found competent to stand trial may nevertheless, under the same standard, be incompetent to make a knowing, intelligent and voluntary choice to forego the defense of insanity. [Emphasis ours]
[Khan, supra, 175 N.J. Super. at 81-82, 417 A.2d 585.]
Under the particular facts of this case we cannot conclude that, in light of defendant's competence to stand trial, the court could logically say that he was incompetent to forego the defense of insanity and diminished capacity. From the various colloquies between the court and defendant, we are fully satisfied that defendant was able to consult with counsel under the criteria enumerated in N.J.S.A. 2C:4-4b(2)(f), as discussed in Khan. He was carefully interrogated by two different judges on separate occasions, the first on May 8, 1990, and the second in late September, 1990, just before trial. He was advised by his attorney in the court's presence "that the insanity defense would stand a great chance of success." To this he responded "I understand exactly what my attorney has told me," but remained steadfast in his determination not to assert the defense. It was further stated before the court by defendant's attorney that there was no question but that defendant was *490 competent to stand trial and that "he has the right to make a decision as to whether or not he wants to pursue the insanity defense."
Although, as in Khan, "it appears doubtful that defendant can ever be convinced that [the alleged hallucinated event did not happen] and that his belief to the contrary is the product of a disordered mind," Khan, supra, 175 N.J. Super. at 83, 417 A.2d 585, he was able to comprehend counsel's effort to help him distinguish between subjective and objective reality and determine the course to be followed in his defense. In deciding to rely on his own perceptions, rather than to accept professional counsel to the effect that those perceptions were faulty, defendant should have known that he would be fully accountable for the risks inherent in whichever choice he made. We therefore conclude that defendant was able to make a knowing, intelligent and voluntary waiver of his right to assert the defense of insanity and diminished capacity.
Finally, defendant contends that the trial court erred in denying his motions for change of venue and for recusal of the Union County Prosecutor's Office, for a mistrial and for a directed judgment of acquittal. He also asserts that he was denied effective assistance of counsel and that the prosecutor improperly commented on the evidence and improperly deprecated the defense in summation. The foregoing contentions are clearly without merit. R. 2:11-3(e)(2). His contention that the convictions were against the weight of the evidence was never made the subject of a motion as required by R. 2:10-1, and the issue is therefore not cognizable on appeal. Ibid. Moreover, the contention is clearly without merit.
Affirmed.
NOTES
[1] The device in defendant's briefcase was detected by the x-ray machine. When the supervising officer asked him what he was carrying in the briefcase defendant answered that it was "a radio for evidence." According to the officer, defendant "was very pleasant," and his explanation was accepted since "he appeared to be a very nice man."
[2] Defendant was tried and convicted of a gun possession charge three months earlier.